IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DINAR CORP, INC., a Nevada corporation; and HUSAM TAYEH, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> STERLING CURRENCY GROUP, LLC, dba DINAR BANKER; TYSON RHAME; FRANK BELL; JORDAN BLISS; MATTHEW ADAMS; and MARK DILEO, <br><br> Defendants. | No. 1:14-cv-00714-AT |

**MOTION FOR PRELIMINARY INJUNCTION
AND SUPPORTING MEMORANDUM OF LAW**

Pursuant to Fed.R.Civ.P. 65(a), Dinar Corp, Inc. ("DCI") and Husam Tayeh ("Sam") (collectively "Plaintiffs"), by and through counsel, respectfully request that the Court enter the proposed form of injunction submitted herewith against Sterling Currency Group LLC, dba Dinar Banker ("SCG"), Tyson Rhame ("Rhame"), Frank Bell ("Bell"), Jordan Bliss ("Jordan"), and Matthew Adams ("Adams") (collectively "Defendants").

Please note that Exhibits 3-10, 12-19, and 22-24 referenced herein are not attached or filed with this Motion because Plaintiffs seek to file such Exhibits

under seal, and Plaintiffs' Motion to File Documents Under Seal has been presented concurrently herewith to the chambers of Judge Totenberg. Pending a ruling on that motion, Plaintiffs reserve the right to file the Exhibits accordingly.

This Motion is supported by the following Memorandum of Law and all pleadings and documents on file with the Court, which are all hereby incorporated by reference.

## MEMORANDUM OF LAW

### I.    Background; Relevant Facts.

DCI owns a website, dinarcorp.com, which provides customers with a safe and reliable means to acquire new Iraqi Dinar currency. *See* Declaration of Husam Tayeh ("Tayeh Decl."), attached as **Exhibit 1** hereto.  SCG owns a similar website, sterlingcurrencygroup.com (which was previously dinarbanker.com), and is one of DCI's largest competitors.  *Id*.  For approximately two years, SCG and the other Defendants have defamed and unfairly competed with Plaintiffs by (1) knowingly posting false, deceptive, and defamatory consumer reviews[1] ("Shill Reviews"); (2) knowingly publishing false and defamatory statements and implications to DCI's advertisers[2]; (3) knowingly publishing false and defamatory statements and

---

[1] *See* First Amended Verified Complaint For Damages And Injunctive Relief  ("FAC"), ¶¶ 23-37.

[2] *See id*. at ¶¶ 38-43.

implications directly and indirectly to DCI's prospective customers[3]; and (4) using information that was fraudulently obtained to send false, misleading, and defamatory information to various banking institutions with whom Plaintiffs did business (the "Banks"), the Better Business Bureau ("BBB"), and various regulatory agencies (the "Agencies"). *See* Tayeh Decl., attached as Exhibit 1 hereto.

This matter was initially filed in Nevada on 10/04/2013 and was then removed to the United States District Court for the District of Nevada (2:13-cv-02106-APG-PAL) (the "Nevada Action"), wherein the case was transferred to this District. *Id*.  However, prior to the case being transferred to this District, the Nevada Court permitted the parties to engage in limited discovery, during which Plaintiffs learned that Defendants had been purchasing currency from DCI for over a year, and that this was being done to obtain information that Defendants could use to interfere with Plaintiffs' business, defame and unfairly compete with Plaintiffs. *Id*.

On approximately 25 occasions, over the last year, Defendants, by and through Bell, induced DCI to sell currency to Defendants, as well as provide Defendants with sensitive information (including bank account information), by

---

[3] *See id*. at ¶¶ 43-46.

misrepresenting Bell as a legitimate customer.  *See* Defendants' Supplement Responses to First Set of Interrogatories, 12:3-23, attached as **Exhibit 2** hereto. Bell induced DCI to enter into the transactions by using fake names and different addresses located throughout the country.  *See* Con-SC278-81, order placed by Flood on 1-8-13, attached as **Exhibit 3** hereto; Con-SC170-72, order placed by Pittford on 11-19-13, attached as **Exhibit 4** hereto. Defendants then used the fraudulently obtained information to send false, misleading, and defamatory information to various Banks, the BBB, and various Agencies. *See* Tayeh Decl., attached as Exhibit 1 hereto.

Defendants' purpose and intent with sending false, misleading and defamatory information to the Banks was to cause the Banks to cease doing business with DCI in an attempt to limit the amount of orders DCI was able to process thereby driving those customers to do business with SCG.  *See* Con-SC30, letter from Bell to Harris Bank dated 2-25-13, attached as **Exhibit 5** hereto; Con-SC46, letter from Bell to HSBC dated 11-19-13, attached as **Exhibit 6** hereto; Con-SC47-48, letter from Bell to First Midwest Bank dated 8-19-13, attached as **Exhibit 7** hereto; Con-SC52, letter from Bell to PNC Bank dated 4-17-13, attached as **Exhibit 8** hereto; Con-SC111, letter from Bell to TCF Financial Corp dated 2-6-

13, attached as **Exhibit 9** hereto; and Con-SC358, Bell's purchase notes for transactions from 4/23/13 to 1/24/14, attached as **Exhibit 10** hereto.

Similarly, by filing various complaints with the BBB, which utilized the fraudulently obtained information in conjunction with false and misleading statements, Defendants essentially turned DCI's "A" rating with the BBB into an "F" rating.  In response to a subpoena served on the BBB in the Nevada Action, the BBB produced records demonstrating that Bell was responsible for many of the "consumer" complaints made to the BBB.  *See* BBB documents, attached as **Exhibit 11** hereto.  Bell made four BBB complaints against DCI over the course of approximately one year.  The complaints are false and/or misleading and further demonstrate SCG's malicious intent to harm DCI's reputation and unfairly compete with DCI.  *See* Tayeh Decl., attached as Exhibit 1 hereto.

Notably, under the name "Jim Thompson," on 7/19/2012, Bell reported to the BBB that by "giving [DCI] an A you are assisting in perpetrating criminal activity." *See* Exhibit 11 hereto.  And on 1/17/2013, again under the name "Jim Thompson," Bell made a separate complaint to the BBB stating that "they are the same people that got in trouble with the Illinois Attorney General in 2007," and that "[y]ou need to rate these guys an F before they steal from anyone else." *See* Exhibit 11 hereto.

Additionally, SCG would use the fraudulently obtained information when sending false and misleading information to all conceivable Agencies that could cause Plaintiffs to suffer further business interruptions or lost profits. *See* Con-SC49-51, letter from Bell to FinCEN dated 3-22-13, attached as **Exhibit 12** hereto; Con-SC55-59, email from Bell to WA DFI dated 3-13-14, attached as **Exhibit 13** hereto; Con-SC77-78, email from Bell to WA DFI dated 10-29-13, attached as **Exhibit 14** hereto; Con-SC60, email from Bell to IL DFI dated 5-31-13, attached as **Exhibit 15** hereto; Con-SC112, letter from Bell to IN DFI dated 4-22-13, attached as **Exhibit 16** hereto; Con-SC115-16, letter from Bell to IN DFI dated 3-14-13, attached as **Exhibit 17** hereto; and Con-SC340-341, complaint to the AR Securities Dept., attached as **Exhibit 18** hereto.

Significantly, when reporting to many Agencies, SCG would cite to the "F" rating by the BBB that Defendants essentially created by virtue of Defendants' false complaints. *See* Con-SC8, letter from Bell to TX DOB dated 1-6-14, attached as **Exhibit 19** hereto.

It speaks volumes that Defendants continued to engage in this conduct even after being sued by Plaintiffs. *See id.*; *see also* Con-SC55-59, email from Bell to WA DFI dated 3-13-14, attached as Exhibit 13 hereto (***Bell cited to the "F" BBB rating he created, as well as the IL attorney general lawsuit against Samir,***

6

***implying that Sam and Samir are the same person and/or that Sam was involved in the AG lawsuit, even though he knew this was false and was recently sued for making such statements)***; Con-SC46, letter from Bell to HSBC dated 11-19-13, attached as <u>Exhibit 6</u> hereto; Con-SC77, email from Bell to WA DFI dated 10-29-13, attached as <u>Exhibit 14</u> hereto; Con-SC170-72, order placed by Pittford dated 11-19-13, attached as <u>Exhibit 4</u> hereto;  Con-SC358, purchase list with DCI's bank information, attached as <u>Exhibit 10</u> hereto.

Plaintiffs made a request to Defendants to cease engaging in the fraudulent and other wrongful conduct, and Defendants blatantly refused.  *See* Email to Gentry, attached as **<u>Exhibit 20</u>** hereto; Emails between counsel, pages 3-4, attached as **<u>Exhibit 21</u>** hereto.

Even after being sued for specifically making these false, misleading, and/or defamatory statements, Defendants still continue to engage in such conduct and refuse to stop.  Accordingly, based upon the extensive nature of Defendants' smear campaign and Defendants' refusal to voluntarily cease engaging in such conduct, it is evident that a preliminary injunction is needed to enjoin the conduct.

Although Defendants purport to be engaging in the complained of conduct to "help keep the foreign currency industry . . . safe and trustworthy,"[4] the reality is

---

4 *See* Defendants' Disclosure Statement at page 3.

that this is nothing more than a cloak being used in an attempt to conceal Defendants' true purpose and intent.   On 5/15/2012, shortly after Defendants' smear campaign commenced, Bell sent an email to SCG's purported marketing agent, Youssef El Hodaigui ("YE"), stating, "***I want to work hard with you when you get back on dinar corp. Their growth is alarming***."   *See* Con-gui16, Email from Bell to YE dated 5-15-12, attached as **Exhibit 22** hereto (emphasis added). Additionally, the subsequent correspondence between Bell and YE (what little was produced) demonstrates that YE was likely performing negative search engine optimization ("SEO") to cause injury to DCI by pushing up negative content about DCI in the search engine results. *See* gui17, email from YE to Bell on 4-3-13, attached as **Exhibit 23** hereto; gui23, email from Bell to YE on 3-14-13, attached as **Exhibit 24** hereto.

Even after Defendants acknowledged that Sam and Samir Al-Tayeh (aka Samir Tayeh (hereinafter "Samir")) was not the same person, Defendants continued to represent otherwise. *See* Exhibit 1 hereto.   More specifically, in the letter Bell sent to FinCEN on 3/22/2013, he states that the "Tayeh family (Husam, *his brother* Hani *and their cousin* Samir Al Taeh) has a history of closing down and restarting this same currency exchange operation under a different name as regulators or consumer advocates close in on them." *See* Con-SC49-51, letter from

8

Bell to FinCEN dated 3-22-13, attached as Exhibit 12 hereto.  This letter, along with the other correspondence, demonstrates that Bell knew that Sam and Samir were two different people but knowingly made false implications otherwise when sending letters to the Banks, various Agencies, and the BBB. *See* Con-SC8, letter from Bell to TX DOB dated 1-6-14, attached as Exhibit 19 hereto (***Bell cited to the "F" BBB rating he created, as well as the IL attorney general lawsuit against Samir, implying that Sam and Samir are the same person and/or that Sam was involved in the AG lawsuit, even though he knew this was false and was recently sued for making such statements***); Con-SC00047-48, letter from Bell to First Midwest dated 8-19-13, attached as Exhibit 7 hereto (Bell attached the IL AG press release wrongfully implying that Sam and Samir are the same person and/or that Sam was involved in the AG lawsuit); Con-SC00052, letter from Bell to PNC Bank dated 4-17-13, attached as Exhibit 8 hereto (Bell attached the IL AG press release wrongfully implying that Sam and Samir are the same person and/or that Sam was involved in the AG lawsuit).

Defendants cannot justify their egregious conduct no matter how hard they attempt to find and manufacture what they now wish was true.  The "evidence" (pertaining to common addresses and website ownership) that Defendants will attempt to use to justify their conduct amounts to nothing more than speculation

and does not begin negate the undisputed facts and circumstances demonstrating Defendants' malicious purpose and intent.

## II.   <u>Legal Analysis.</u>

### A.   <u>Preliminary Injunction Standard.</u>

"A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr*, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).  As a general proposition of law, the "standard for issuing a permanent injunction is substantially the same as that applied to a request for preliminary injunctive relief, except that the plaintiff must prove actual success on the merits rather than the likelihood of success on the merits." 42 Am.Jur.2d Injunctions § 10 (Supp.2008).

The Eleventh Circuit will not disturb a district court's decision to grant or deny a preliminary injunction absent a clear abuse of discretion. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1253-54 (11th Cir. 2005).  "In considering the motion for preliminary injunction, the district court could assess the likelihood

that [the plaintiff's] evidence would be persuasive to a fact-finder in light of [the defendants'] evidence." *Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006).

**B.    Plaintiffs' claim for injunctive relief under Georgia's Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. §§ 10-1-372(8) and 10-1-373.**

Injunctive relief is the sole remedy under the UDTPA, although other actions based on common law or other statutory authority are not expressly precluded. *See Catrett v. Landmark Dodge. Inc.,* 253 Ga.App. 639, 644, 560 S.E.2d 101, 106 (2002) (citing O.C.G.A. § 10–1–373(a)); *Lauria v. Ford Motor Co.,* 169 Ga. App. 203, 206, 312 S.E.2d 190, 193 (1983). "[T]o be entitled to injunctive relief, a plaintiff must establish that he is '[a] person likely to be damaged by a deceptive trade practice of another." ' *Moore–Davis Motors. Inc. v. Joyner,* 252 Ga.App. 617, 619, 556 S.E.2d 137, 140 (2001) (quoting O.C.G.A. § 10–1–373(a)). That is, Plaintiffs must show that they are "likely to be damaged in the future by some deceptive trade practice of [Defendant]." *Bolinger v. First Multiple Listing Service. Inc.,* 838 F.Supp.2d 1340, 1364 (N.D.Ga.2012) (citation and internal quotation marks omitted). Injunctive relief is available under the UDTPA "without proof of monetary damage, loss of profits or intent to deceive."

*BellSouth Corp. v. Internet Classifieds of Ohio,* 1997 WL 33107251, at *24 (N.D.Ga. November 12, 1997) (citing O.C.G.A. § 10–1372(a)).

The UDTPA requires only that plaintiff be a person who has suffered an injury due to defendant's deceptive trade practice, and does not require that plaintiff be a consumer, or a showing of injury to a consumer. *See In re Johnston Indus., Inc.*, 300 B.R. 821 (Bankr. M.D. Ga. 2003).  However, plaintiffs asserting state law claims under the UDTPA must still establish prerequisites for preliminary injunction in order to be entitled to relief. *Energy Four, Inc. v. Dornier Med. Sys*., Inc., 765 F. Supp. 724, 731 (N.D. Ga. 1991).

### i.       Substantial likelihood of success on the merits.

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . . [d]isparages the goods, services, or business of another by false or misleading representation of fact . . . ." O.C.G.A. § 10-1-372(8).  As discussed, over the course of approximately two years, in the course of operating SCG, Defendants have continuously disparaged Plaintiffs' business by making the overall false or misleading representations/implications that (1) Sam and Samir are the same person; (2) Plaintiffs were sued by the IL Attorney General for fraudulently failing to fulfill orders from customers; (3) Samir operates DCI, and Sam was only named as the owner of DCI to fraudulently

conceal the real owner of DCI; (4) Sam knowingly assisted Samir's fraudulent conduct, including fraudulently failing to fulfill orders from customers; and (5) Sam and Samir continue to knowingly enable each other to engage in fraudulent conduct (collectively the "False Statement").

DCI has never been led by Samir; Samir has never been involved in DCI; and Samir or Hani Tayeh is not the same person as the Plaintiff, Sam, in this case. *See* Declaration of Samir Tayeh ("Samir Decl."), attached as **Exhibit 25** hereto; Tayeh Decl., attached as Exhibit 1 hereto. Additionally, the 2007 Attorney General action repeatedly referenced by Defendants was not brought against DCI and was in no way related to DCI, DinarXChange, Inc. or Eumma, Inc.   *Id*. Although Sam did initially change the name of his company from DinarXChange, Inc. to Eumma, Inc., before changing the name to DCI, the name changes had nothing to do with any negative publicity, complaints, or legal issues.   *Id*. DinarXChange, Inc. and Eumma, Inc. have never been sued by an attorney general from any state, and Samir has never owned or operated either company.   *Id*. Although Sam did work for his brother, Samir, for a brief period in the currency exchange business, this business relationship ended abruptly in early 2005. *Id*. Sam did not agree with how Samir wanted to conduct the business, and, as a result,

Sam created his own company within a year of leaving Samir's company. *Id*. Sam has not engaged in any currency related business with Samir since early 2005. *Id*.

Accordingly, the False Statements made by Defendants are completely false, misleading and defamatory, and Plaintiffs have demonstrated a likelihood of success on the merits.

ii.   **Irreparable injury will be suffered unless the injunction issues**.

Irreparable harm is generally caused when a company's goodwill is negatively impacted. *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc*., 944 F.2d 597, 602 -603 (9th Cir. 1991) (holding that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"); *Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1057 (C.D. Cal. 2011) (holding that the company's "damages would be difficult to value due to the unknown impact on [its] goodwill"). Additionally, "[a]s a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir.1993).

The irreparable harm that has already been caused and will continue to be caused if the requested injunctive relief is not granted is substantial. Defendants' conduct has caused (1) a loss of business, business opportunities,

revenue, and growth; (2) several bank terminations, as well as the resulting harm from the loss of Plaintiffs' business relationships with the Banks; and (3) additional fines from Agencies that would not have been incurred but for Defendants' conduct. Tayeh Decl., attached as Exhibit 1 hereto.  It is impossible to quantify how many sales were lost as a result of the Shill Reviews and the "F" BBB rating caused by Defendants. *Id*.

Similarly, it is impossible to quantify (1) how many sales will continue to be lost if Defendants are not enjoined from posting additional Shill Reviews; (2) the overall harm that would be caused to Plaintiffs' reputations if Defendants are not enjoined from making additional False Statements; (3) how many additional bank terminations will be caused if Defendants are not enjoined from making additional False Statements and what the impact will be on Plaintiffs' business and/or the other derivative loss that will result, including, but limited to, the inability to process all orders received, as well as further the grow the business; and/or (4) the extent to which some Agencies may cause DCI to suffer lost profits, expenses, and costs as a result of Defendants making additional False Statements. *Id*.

Because Defendants have admitted that they will continue to engage in the wrongful conduct unless enjoined, Plaintiffs have demonstrated that they are

likely to be damaged in the future by some deceptive trade practice of Defendants. Accordingly, irreparable injury will be suffered unless the requested injunctive relief is granted.

iii.    **The threatened injury to Plaintiffs outweighs whatever damage the proposed injunction may cause Defendants.**

As discussed, the continued threatened irreparable injury to Plaintiffs is substantial.  If the requested injunctive relief is not granted, Plaintiffs will continue to lose sales, suffer further harm to their reputations, suffer further bank terminations, and incur additional costs and expenses. *Id*. Notably, the bank termination issue has caused and will continue to cause tremendous harm to Plaintiffs. *Id*.  There are only a limited number of banks with whom Plaintiffs can do business, and Plaintiffs will continue to lose the ability to process orders if further bank terminations occur. *Id*.  Plaintiffs cannot realistically continue to sell currency if no banks will take deposits from the currency sales that are being made. *Id*. Additionally, delayed processing times resulting from a limited ability to process sale orders will continue to cause prospective customers to take their business elsewhere. *Id*.  Over time, it is likely that such a continued occurrence would bring about the complete demise of DCI.  *Id*.

Comparatively, no harm would be caused to Defendants if the requested injunctive relief were granted.  Although Defendants would likely see a

slight decrease in sales, this would only be the result of their inability to continue to unfairly compete with Plaintiffs and unlawfully divert sales. *Id.* "[I]t is well settled that false commercial speech is not protected by the First Amendment and may be banned entirely." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 949 (3d Cir. 1993).

### iv.  If issued, the injunction would not be adverse to the public interest.

"Consumer deception, by its very nature, is against the public interest." *Energy Four, Inc. v. Dornier Med. Sys., Inc.*, 765 F. Supp. 724, 734 (N.D. Ga. 1991). Similarly, allowing overtly deceptive and unfair trade practices to continue is against the public interest. *See id.* SCG is one of the largest dinar currency sellers in the country, and failing to enjoin Defendants' conduct will only encourage larger companies to engage in unfair business practices. Accordingly, if issued, the injunction would not be adverse to the public interest.

Therefore, the Court should grant the injunctive relief being requested by Plaintiffs.

### v.  Amount of security.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to

have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65. Because it is difficult to imagine how Defendants could be harmed from being enjoined from republishing the False Statements and/or engaging in the other clearly wrongful conduct, any required security should be reasonably low. Accordingly, Plaintiffs request that the Court order Plaintiffs to post security in the amount of $100.00.

### vi.   Attorneys' fees and costs under O.C.G.A. § 10-1-373(b).

"The court, in its discretion, may award attorney's fees to the [plaintiff] if . . . [t]he party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive," and "[c]osts shall be allowed to the prevailing party unless the court otherwise directs." O.C.G.A. § 10-1-373(b).

Plaintiffs (through counsel) requested that Defendants (through counsel) stipulate to an injunction "to avoid further attorneys' fees and costs." *See* Emails between counsel, page 4, attached as Exhibit 21 hereto. However, even though Plaintiffs twice explained to Defendants (*including quoting their own documents*) why the conduct was egregious, Defendants still refused to stipulate to an injunction or even entertain attempting to reach an agreement. *See id.* at 4, 3, 2, 1. After Defendants' blanket refusal to entertain resolving the ongoing issues without the Court's assistance, Defendants were specifically informed that

injunctive relief would be sought and to "please be advised that this correspondence may be used as evidence in seeking attorneys' fees, costs, and/or sanctions." *See id*. at 3.

In addition to Defendants' refusal to voluntarily cease their egregious conduct, Defendants' prior conduct also demonstrates that they "willfully engaged in the trade practice knowing it to be deceptive." *See* Con-SC55-59, email from Bell to WA DFI dated 3-13-14, attached as <u>Exhibit 13</u> hereto (Bell cited to the "F" BBB rating he essentially created, as well as the IL attorney general lawsuit against Samir, implying that Sam and Samir are the same person and/or that Sam was involved in the AG lawsuit, even though he knew this was false and was recently sued for making such statements.).

Accordingly, the Court should find that Defendants willfully engaged in the trade practice knowing it to be deceptive and award Plaintiffs their attorneys' fees and costs.

C.    **Plaintiffs' defamation claim.**

Plaintiffs' defamation claim is based upon common law, as well as O.C.G.A. §§ 51-5-1, *et seq*. "A cause of action for defamation consists of four elements: '(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to

negligence; and (4) special harm or the actionability of the statement irrespective of special harm.' " *Smith v. Stewart*, 291 Ga. App. 86, 91-92, 660 S.E.2d 822, 828-29 (2008) (citation omitted).  "A written defamatory statement is actionable as either libel per se or libel per quod." *Id.* at 96, 660 S.E.2d at 831.  "Libel per se consists of a charge that one is guilty of a crime, dishonesty[,] or immorality...." *Id*.  "Defamatory words which are actionable per se are those which are recognized as injurious on their face-without the aid of extrinsic proof."  *Id*.  "[In contrast], if the defamatory character of the words does not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo."  *Id.* (Citations and punctuation omitted.).  "Unlike in an action for libel per quod, in an action for libel per se, 'special damages need not be proved because damage is inferred.' " *Id.* (citing *Bellemeade, LLC v. Stoker,* 280 Ga. 635, 637, 631 S.E.2d 693 (2006), citing O.C.G.A. § 51-5-4(b)).

"As to proof of malice, proof that the writing is false, and that it maligns the private character or mercantile standing of another, is itself evidence of legal malice." *Montgomery v. Pacific & Southern Co.*, 131 Ga.App. 712, 717, 206 S.E.2d 631 (1974).  In other words, "[s]tatements which tend to injure one in his trade, occupation or business are libelous per se" and malice is presumed. *John D.*

*Robinson Corp. v. S. Marine & Indus. Supply Co.*, 196 Ga. App. 402, 404, 395 S.E.2d 837, 840 (1990).  "Even the malicious intent of the employee is imputable to the employer in a libel case."  *Id. at* 405, 395 S.E.2d at 840.  "Generally, also, a republisher of a defamatory statement is equally liable with the original publisher thereof." *Atlanta Journal Co. v. Doyal*, 82 Ga. App. 321, 327-28, 60 S.E.2d 802, 809-10 (1950) (emphasis added).

"Because [plaintiff] is a private individual and not a public figure, an ordinary negligence standard applies, meaning that []he must show that each of the defendant publishers failed to exercise ordinary care when they published the [content]." *Smith,* 291 Ga. App. at 97-98, 660 S.E.2d at 832.  "[T]he Georgia legislature intended for the state's defamation law to be consistent with common law, which provided corporations a cause of action for libel." *State Farm Mut. Auto. Ins. Co. v. Hernandez Auto Painting & Body Works, Inc.*, 312 Ga. App. 756, 758, 719 S.E.2d 597, 599 (2011).  "The test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality in the context in which it was uttered or published." *Smith,* 291 Ga. App. at 93-95, 660 S.E.2d at 829-31.

Because Plaintiffs' basis for injunctive relief under the UDTPA is the same for Plaintiffs' defamation claim, Plaintiffs need not repeat the entire analysis,

which is hereby incorporated by reference.  In short, for the same reasons above, the False Statements are per se defamatory.  Defendants continue to maliciously publish to third parties various factual representations, which falsely and wrongfully indicate that Plaintiffs were and are involved in a scheme to defraud consumers, and that the "Tayeh family (Husam, *his brother* Hani *and their cousin* Samir Al Taeh) has a history of closing down and restarting this ***same currency exchange operation*** under a different name as regulators ***or consumer*** advocates close in on them." *See* Con-SC49-51, letter from Bell to FinCEN dated 3-22-13, attached as <u>Exhibit 12</u> hereto.

Accordingly, the Court should grant the injunctive relief being requested by Plaintiffs.

### D.   Plaintiffs' tortious interference with business relations claim.

To prevail "under a theory of tortious interference with business relations, a plaintiff must show defendant: (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." *Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*, 213 Ga. App. 333, 334-35, 444 S.E.2d 814, 817-18 (1994).  "Malice, as herein used, is a term to be given a liberal meaning; malicious or maliciously

means any unauthorized interference, or any interference without legal justification or excuse." *Id*.  "A cause of action for tortious interference with business relations encompasses interference with a prospective business relationship as well as existing ones, and liability results not only from disruption of the relationship but also from elimination of the injured party's ability to perform." *Id*.

Again, because Plaintiffs' basis for injunctive relief under the UDTPA is the same for Plaintiffs' tortious interference claim, Plaintiffs need not repeat the entire analysis, which is hereby incorporated by reference. It is evident that Defendants made the False Statements in bad faith given the implications made by the False Statements, the various ways in which the False Statements were published, the frequency with which the False Statements were published, and the continued republication of the False Statements even after being sued. Additionally, as discussed, the bank termination issue has caused and will continue to cause tremendous harm to Plaintiffs.  Over time, it is likely that such a continued occurrence would bring about the complete demise of DCI.

Accordingly, the Court should grant the injunctive relief being requested by Plaintiffs.

/ / /

/ / /

**III.**  **Conclusion.**

Therefore, based upon the foregoing, Plaintiffs respectfully request that the Court (1) enter the proposed form of injunction submitted herewith; (2) award Plaintiffs their attorneys' fees and costs, pursuant to O.C.G.A. § 10-1-373, upon the Court's approval of Plaintiffs' itemized application for the same; and (3) grant such other and further relief as the Court finds reasonable and necessary. Respectfully submitted this 25th day of November, 2014.

/s/Daniel R. Warner
Daniel R. Warner
Kelly / Warner, PLLC
8283 N. Hayden Road, Ste. 229
Scottsdale, AZ  85258
Phone:     (480) 331-9397
Facsimile: (866) 961-4984
dan@kellywarnerlaw.com

and

/s/ Alycen A. Moss
Alycen A. Moss
Georgia Bar No. 002598
Cozen O'Connor
303 Peachtree Street, N.E., Ste. 2200
Atlanta, GA  30308
Phone:     (404) 572-2052
Facsimile: (877) 728-1396
Email: amoss@cozen.com

*Attorneys for Plaintiffs Dinar Corp., Inc. and Husam Tayeh*

24

CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading, on the date stated below, was filed with the Clerk of the Court using the CM/ECF system, which automatically and contemporaneously sends electronic notification and a service copy of such filing to the following counsel of record:

> David M. Lilenfeld
> Robin L. Gentry
>  2970 Peachtree Road, NW, Suite 530
> Atlanta, Georgia 30305
> david@lilenfeldpc.com
> robin@lilenfeldpc.com

Dated: November 25,  2014

> /s/Daniel R. Warner
> Attorney for Plaintiffs